**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| In re: | Chapter 11 |
| LiveConnections.org d/b/a World Café Live, | Case No. 26-10973 (AMC) |
| Debtor. | |
| In re: | Chapter 11 |
| Real Entertainment-Philadelphia, LLC, | Case No. 26-10974 (AMC) |
| Debtor. | |

**THE TRUSTEES OF THE UNIVERSITY OF PENNSYLVANIA AND
HAJOCA 3025, INC.'S MOTION TO COMPEL THE DEBTORS
TO PERFORM POST-PETITION LEASE OBLIGATIONS AND PROVIDE
ADEQUATE PROTECTION OR SURRENDER THE PREMISES**

The Trustees of the University of Pennsylvania (the "**University**") and Hajoca 3025, Inc. ("**Hajoca,**" and together with the University, collectively, the "**Movants**" or the "**University Parties**"), by and through their undersigned counsel, pursuant to Sections 361, 362(d), 363(e), and 365(d)(3) of Title 11 of the United States Code ("**Bankruptcy Code**"), and Rule 4001(a) of the Federal Rules of Bankruptcy Procedure ("**Bankruptcy Rules**"), request entry of an order compelling the Debtors to perform their post-petition obligations under the applicable lease, including payment of post-petition rent to adequately protect the respective interests of the University Parties in and to the applicable property or immediately surrender the Premises (as defined below). In support thereof, the University Parties rely on the Declaration of Edwin Datz ("**Datz Decl.**"), and respectfully state as follows:

**INTRODUCTION**

1.      The University is the fee owner of the parcel of land known as and located at 3025 Walnut Street, Philadelphia, Pennsylvania, 19104 (the "**Property**"). The University and Hajoca are parties to that certain ground lease and development agreement pursuant to which the University leases to Hajoca the Property and the improvements erected thereon including the Hajoca Building, an art deco landmark (the "**Building**"). The Building was designed by Philadelphia architect Clarence E. Wunder and constructed between 1920 and 1931. It is listed on the National Registry of Historic Places.

2.      In 2003, Debtor Real Entertainment-Philadelphia LLC ("**Real**"), then owned and operated by Hal Real, leased a portion of the Building and entered into a License Agreement (hereinafter defined) with the University. The License Agreement provided Real with the right to use the University's trademark protected name "World Café Live" in connection with a proposed live performance venue featuring artists showcased on the World Café radio program created by WXPN-FM, a radio station owned and operated by the University. WXPN began broadcasting the World Café program in 1991 (and still does) and since then the World Café program has established a wide following.  The License Agreement permitted Real to leverage the reputation of the World Café name to create the World Café Live music venue in the Building, which also houses the headquarters of WXPN.  In the decades since then, WXPN and the World Café Live brought independent, international, established performers and rising stars to the West Philadelphia community and surrounding Philadelphia metropolitan area.

3.      While the University established the World Café radio program that permitted Real to create the World Café Live venue, the applicable lease always provided for the payment of rent. On several occasions through June 30, 2021, the University agreed to temporary rent relief and

lease modifications by entering into seven written amendments to the lease. The University consistently maintained that Real's use of the Hajoca building required the payment of ongoing rent and payment of past-due rent, and Real repeatedly acknowledged those obligations in the written lease amendments. Real stopped paying rent entirely in April 2022. By late 2024, faced with potential funding pressures, the University demanded Real find new capital.

4.      By March 2025, more than $1 million in unpaid rent had accrued under the lease. Joseph Callahan entered into an agreement with Hal Real to acquire Mr. Real's ownership interest in and to the Debtors.  As the new owner of the Debtors, Mr. Callahan made several promises to improve the performance of World Café Live, including pledging to invest new capital to cure the lease defaults and stabilize operations going forward. The University Parties and Mr. Callahan briefly discussed a path forward. Mr. Callahan's demands were outrageous. Among other things, he proposed the University enter a long-term ground lease of the Hajoca building that provided for $1 per year in rent and waiver of over $1 million in past-due rent owed by then.  Mr. Callahan's proposals were non-starters. Faced with the realization that Mr. Callahan would not keep his promise to cure the existing defaults and invest new capital to stabilize the operations of World Café Live, the University Parties determined to move on by (among other things) terminating the lease and initiating eviction proceedings against Real.  Someone other than Mr. Callahan was needed to right this long listing ship.

5.      Mr. Callahan delayed eviction by causing the Debtors and the Bean Foundation ("his philanthropic entity")[1] to sue the University Parties and consolidated that action with the eviction proceeding a few weeks before trial was scheduled to occur. Most recently, the Callahan parties requested trial in the consolidated proceeding occur no earlier than December 2027.

---

[1] Cash Collateral Motion (defined below) at ¶ 7.

6. The Debtors filed for bankruptcy on March 10, 2026. As a debtor in bankruptcy, Real is obligated to timely perform all obligations arising under its lease. Moreover, the Debtors' use of the Hajoca building must be prohibited unless the University Parties' interests in the lease and premises are adequately protected. The Debtors failed to pay rent due on April 1 and May 1, and their initial filings establish they will not (and cannot) pay rent going forward. By this Motion, the University Parties request the Court order the Debtors to timely pay rent going forward (and otherwise honor their lease obligations) or immediately surrender the premises.

## JURISDICTION AND VENUE

7. The Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b). The statutory predicates for the relief requested herein are sections 361, 362(d), 363(e), and 365(d)(3) of the Bankruptcy Code.

8. Movants consent to the entry of a final order or judgment by this United States Bankruptcy Court for the Eastern District of Pennsylvania ("**Court**") if it is determined that the Court, absent consent of the parties, cannot enter a final order or judgment consistent with Article III of the United States Constitution.

## BACKGROUND

**A. The University Created World Café and Facilitated the Establishment of the World Café Live in the Hajoca Building**

9. On or about October 14, 1991, WXPN-FM, a station licensed to and operated by the University, launched World Café, a nationally syndicated music program originally distributed by Public Radio International that was designed to attract younger listeners to public radio

4

stations.[2] Beginning in 1997, the University obtained numerous federal "World Café" trademark registrations, which remain active and enforceable. Datz Decl. at ¶ 2.

10.     The University is the fee simple owner of the Property, as evidenced by a true and correct copy of the University's vesting deed of the Property attached to the Datz Decl. as Exhibit A. The University and Hajoca Associates, L.P. ("**Hajoca L.P.**"), then owned by local developer Carl Dranoff, entered into a Lease and Development Agreement dated November 24, 2003. A true and correct copy of the Memorandum of the Lease and Development Agreement, excluding exhibits, is attached to the Datz Decl. as Exhibit B.  Under the Lease and Development Agreement, the University agreed to lease the Property to Hajoca L.P. until November 30, 2043 in exchange for Hajoca L.P. agreeing to develop the Hajoca building to create a studio and offices for radio station WXPN and a restaurant and entertainment venue known as World Café Live. *See* Datz Decl., Ex. B, § 1.

11.     Hajoca L.P. subleased approximately 24,261 sq. ft. of the Building ("**Premises**") to Debtor Real Entertainment-Philadelphia, Inc.[3] (i.e. Real) pursuant to that certain Lease Agreement dated November 24, 2003 ("**Original Lease,**" and as amended below by the First Amendment, Second Amendment, Third Amendment, Fourth Amendment, Fifth Amendment, Sixth Amendment, and Seventh Amendment, the "**Lease**") for a 15-year term ("**Initial Term**") for the purpose of operating the business known as World Café Live. A true and correct copy of the Original Lease is attached to the Datz Decl. as Exhibit C.

---

[2]    Distributed by National Public Radio since 2005, the two-hour program airs Monday-Friday and features live performances and interviews with both established and emerging artists spanning a wide range of musical genres. Today, the program also produces two weekly podcasts containing interviews and information about musicians: "World Cafe Words and Music," which features established artists, and "World Cafe Next," which highlights emerging artists. Datz Decl. at ¶ 2 n.2.

[3]    Real Entertainment-Philadelphia, Inc. later converted to a limited liability company, as detailed below.

12. Simultaneous with the Lease, the University and Real's affiliate, Real Entertainment Group, Inc., entered that certain License Agreement dated November 24, 2003 ("**License Agreement**"), whereby the University agreed to license its World Café trademarks and derivatives thereof for use in connection with the World Café Live venue. Datz Decl. at ¶ 6.

13. On November 26, 2019, Real Entertainment Group, Inc. assigned all of its rights and obligations under the License Agreement to Real. As a result, Real became both the lessee under the Original Lease and licensee under the trademark License Agreement. Datz Decl. at ¶ 7.

14. Pursuant to the Original Lease, Real agreed to pay a monthly base rent (the "**Minimum Rent**"), as well as late charges, Utilities, Common Area Operating Expenses, and Real Estate Taxes (collectively "**Additional Rent**" and together with Minium Rent, "**Rent**"). *See* Original Lease, §§ 5.1-5.4 (rent and late charges); 7.1(b) (utilities); 9.4 (common area operating expenses); 10.2 (taxes).

15. Pursuant to the Original Lease, Real agreed to pay $345,000 in Minimum Rent per year for the first 2 years of the Lease and $395,000 in Minimum Rent per year for the remainder of the Initial Term. *See id.*, §§ 5.2(a)(i)-(ii).

16. The Original Lease provides that no alteration, amendment, change or other addition to the Original Lease shall be binding upon the parties unless reduced to a writing and executed by the party against which it is to be enforced. *See id.*, § 21.6(a).

**B. The Lease was Repeatedly Modified Via Written Amendments to Enable the World Café Live Venue to Survive**

17. While the cultural value of the World Café Live was clear, profitability remained elusive. In response, from 2003 to 2021, the parties amended the Original Lease several times— in writing—either to extend the lease term or adjust Real's Rent obligations. Datz Decl. at ¶ 8.

18.     On May 23, 2007, Hajoca L.P. and Real entered into the First Amendment to the Original Lease (the "**First Amendment**").  A true and correct copy of the First Amendment is attached to the Datz Decl. as Exhibit D. The First Amendment modified the Minimum Rent but otherwise ratified the remaining terms of the Original Lease *See* First Amendment §§ 1-2.

19.     On October 1, 2007, Hajoca L.P. and Real entered into the Second Amendment to the Original Lease ("**Second Amendment**"). A true and correct copy of the Second Amendment is attached to the Datz Decl. as Exhibit E. As part of the Second Amendment, Hajoca L.P. agreed to defer Real's scheduled Minimum Rent increase until October 1, 2009. *See* Second Amendment § 2.

20.     On February 11, 2010, Hajoca L.P. and Real entered into the Third Amendment to the Original Lease ("**Third Amendment**"). A true and correct copy of the Third Amendment is attached to the Datz Decl. as Exhibit F. As part of the Third Amendment, Hajoca L.P. again agreed to defer Real's scheduled Minimum Rent increase until April 1, 2011. *See* Third Amendment § 1.

21.     On March 1, 2013, Hajoca L.P. and Real entered into the Fourth Amendment to the Original Lease ("**Fourth Amendment**"). A true and correct copy of the Fourth Amendment is attached to the Datz Decl. as Exhibit G. As part of the Fourth Amendment, Hajoca L.P. and Real confirmed that the Initial Term ended on September 30, 2019, *see id.* § 1 and agreed to a graduated Minimum Rent payment plan for Real for the remainder of the Initial Term. *See id.* § 2.

22.     On May 31, 2018, Hajoca L.P. and Real entered into the Fifth Amendment to the Original Lease ("**Fifth Amendment**"). A true and correct copy of the Fifth Amendment is attached to the Datz Decl. as Exhibit H.  As part of the Fifth Amendment, Hajoca L.P. and Real agreed to extend the Initial Term to September 30, 2021. *See* Fifth Amendment § 2(a). Real also

acknowledged that, as of May 30, 2018, it owed Hajoca L.P. $206,808.92 in unpaid Rent. *See id*.
§ 4.

23.     On November 7, 2019, Hajoca L.P., then owned by Carl Dranoff, assigned all of its right, title, and interest in the Lease with Real to Hajoca, a not-for profit Pennsylvania corporation and a wholly owned subsidiary of the University. A true and correct copy of the assignment and assumption agreement is attached to the Datz Decl. as Exhibit I.

24.     On November 20, 2019, Hajoca and Real entered into the Sixth Amendment to the Original Lease ("**Sixth Amendment**"). A true and correct copy of the Sixth Amendment is attached to the Datz Decl. as Exhibit J. As part of the Sixth Amendment, Real (1) agreed to convert from a Pennsylvania corporation into a Pennsylvania limited liability company, *see* Sixth Amendment § 2, (2) acknowledged that it owed Hajoca $552,858.49 in unpaid Rent under the Lease, and (3) agreed to "remain[] responsible to all sums due under the Lease." *Id*. §§ 5(a)-(b). Hajoca and Real also agreed to extend the Initial Term to September 30, 2029. *See id*. § 2. Real converted to a limited liability company on November 26, 2019.

25.     On June 30, 2021, Hajoca and Real entered into the Seventh Amendment to the Original Lease ("**Seventh Amendment**"). A true and correct copy of the Seventh Amendment is attached to the Datz Decl. as Exhibit K. Under the Seventh Amendment, Hajoca forgave $300,000 of Real's unpaid Rent, the parties agreed to a repayment plan for the remaining unpaid Rent, and the parties extended the Initial Term to September 30, 2031. *See* Seventh Amendment at 1-2.

26.     While the amendments to the Original Lease provided temporary Rent reductions for Real, they also increased the Rent for the remainder of the Lease term so that Hajoca would "receive[] the same dollar amount of base rent as originally planned." *See* Second Amendment at 1; *see, e.g.*, Third Amendment ¶ 1 (reducing Rent to $18,750 per month from November 2008

8

through April 2010 but increasing Rent to $28,750 per month from May 2010 through March 2011 and $33,750 per month for remainder of Lease term).

27.     Further, Real affirmed not only the amount of past and future monetary Rent it owed under the Lease but also Hajoca's right to collect Rent. *See* Sixth Amendment §5 (Real LLC acknowledging that it owed Hajoca $552,858.49 in Rent as of September 30, 2019 and agreeing to "remain[] responsible to all sums due under the Lease").

28.     Real, however, has not paid Rent under the Lease since April 2022. Datz Decl. at ¶ 9.

**C.  Joseph Callahan Took Control of the Venue in March 2025 and Soon Made Unreasonable and Unrealistic Demands that the University Allow Him to Use the Hajoca Building Rent Free**

29.     By December 2024, the University Parties faced pressure to generate revenue from the Premises to prepare for potential federal funding cuts, and the University Parties gave Real a deadline of March 31, 2025, to find a new capital partner or operator that could commit to making monthly Rent payments under the Lease. Datz Decl. at ¶ 18.

30.     On March 25, 2025, the Debtors, Mr. Callahan, and The Bean Foundation (the "**Foundation**") executed an agreement that made Mr. Callahan the sole member of LiveConnections.org ("**LiveConnections**"), and therefore, the owner of Real[4] (the "**WCL Transition Agreement**"). A true and correct copy of the WCL Transition Agreement is attached to the Datz Decl. as Exhibit L.

31.     The WCL Transition Agreement acknowledged not only that Real owed about $1,250,000 in unpaid rent under the Lease but also that Mr. Callahan had not reached an agreement with the University Parties regarding the Premises. *Id.* ("[Callahan] and WCL *will explore*

---

[4]     By this point, Debtor LiveConnections.org had become Real's sole member.

*amending the lease* or purchasing the property from the landlord to settle outstanding claims. *Discussions* have also commenced with the University of Pennsylvania regarding a ground lease and a potential purchase of the building, which may serve as collateral for restructuring WCL's debt.") (emphasis added).

32.     On or about March 28, 2025, the Foundation, the University Parties, and David Griffith (a former board member of LiveConnections.org) discussed the Foundation's plans for World Cafe Live. Datz Decl. at ¶ 19.

33.     On April 7, 2025, the Foundation emailed Craig Carnaroli, former Senior Executive Vice President of the University, a *non-binding* term sheet proposal for a ground lease ("**April 7 Term Sheet**"). A true and correct copy of the April 7 Term Sheet is attached to the Datz Decl. as Exhibit M.

34.     Mr. Callahan and the Foundation presented the April 7 Term Sheet as non-binding. *See id.* at 2 (Mr. Callahan describing the April 7 Term Sheet "as the basis for negotiating a detailed, mutually acceptable Ground Lease between the University of Pennsylvania and The Bean Foundation"); *id.* (April 7 Term Sheet stating that its terms "are not binding on the Parties until Tenant and Landlord have executed a mutually acceptable Ground Lease for the proposed project").

35.     This proposal surprised Mr. Carnaroli and the University Parties because, after they repeated for months that the new World Café Live operator would need to pay Rent under the Lease, the Foundation instead proposed a 99-year ground lease with annual rent payable to the University of $1.00 and which would also include the transfer by the University of fee title ownership of the Building and improvements for free for the term of the ground lease. Datz Decl. at ¶ 22; *id.*

36.     Not only would this astonishing proposed ground lease structure require the University to tender control of the property and fee ownership to the Hajoca building for free, ***but to add insult to injury, would then actually require the University to pay rent to the Foundation*** to permit WXPN (a department of the University) to continue operating its radio station in the Building during the 99-year lease term. Datz Decl. at ¶ 23; *id*.

37.     In other words, Mr. Callahan (who had assumed responsibility for paying Rent under the Lease as the owner of Real through the WCL Transition Agreement) proposed that the University Parties (a) slash Real's annual Rent under the Lease by almost $3,000,000 for the remainder of the current lease term; (b) transfer to the Foundation control and fee title ownership of the Building for free for the entire 99-year lease term; (c) extend the term of the ground lease by 92 years for $92; and (d) then be required to pay rent to the Foundation to continue to use and operate WXPN in the  Building – its home for the past 20 years.

38.     Unsurprisingly, the April 7 Term Sheet was a non-starter for the University Parties, but instead of negotiating reasonable terms for paying Rent under the Lease, Mr. Callahan and the Foundation doubled down.

39.     At 8:43 a.m. on April 11, 2025, the Foundation presented Mr. Carnaroli and the University Parties with a revised ground lease proposal spanning 85 pages ("**April 11 Term Sheet**") and imposed a 3:00 p.m. deadline to execute the term sheet. A true and correct copy of the April 11 Term Sheet is attached to the Datz Decl. as Exhibit N.

40.     The April 11 Term Sheet outlined a potential 40-year ground lease in which the University, the Foundation, WXPN, and the Debtors would split revenues from a series of hoped-for mega-star concerts at the Premises each year. *See* April 11 Term Sheet at 83.

11

41.     The April 11 Term Sheet also acknowledged the non-binding nature of the parties' negotiations thus far. *See, e.g.*, *id.* at 51. (Foundation requesting the University to define its "position regarding a proposed partnership with The Bean Foundation").

42.     The University Parties had significant reservations about the feasibility of the Foundation's proposed plans for several reasons, including (1) the plan's completely unrealistic financial projections, which miscalculated potential annual revenues by over $100 million; (2) the lack of a proposal containing specific plans and specifications detailing how the Foundation would implement the technological upgrades required for its proposed virtual concert experiences; and (3) the unrealistic assumption of securing 9, 12, or 18 mega-star concert contracts per year lacking any existing commitments or detail about implementation of plans to secure such talent. Datz Decl. at ¶ 25.

43.     On April 11, 2025, at 4:09 p.m., Mr. Carnaroli asked Mr. Callahan to meet and review the financial assumptions in the April 11 Term Sheet and explore an alternative model for a potential ground lease between the University and the Foundation. Datz Decl. at ¶ 26.

44.     On April 14, 2025, the parties met to discuss the April 11 Term Sheet, and Mr. Carnaroli suggested that the Foundation start by paying the operating expenses for the Premises until it could provide the University with a proof of concept and detailed plans and projections regarding the April 11 Term Sheet. Mr. Callahan and the Foundation ignored this proposal. Datz Decl. at ¶ 29.

45.     Instead, on April 18, 2025, Michael Bowman (counsel for the Foundation) emailed Mr. Carnaroli a third ground lease term sheet ("**April 18 Term Sheet**") and misrepresented that the University had agreed to a proposal at the April 14, 2025 meeting, when in fact, no such

agreement was reached at such meeting or at any time thereafter. A true and correct copy of the April 18 Term Sheet is attached to the Datz Decl. as Exhibit O.

46.     But Mr. Bowman's misrepresentation regarding the outcome of the April 14 meeting was contradicted by, among other things, the plain text of the April 18 Term Sheet—a document prepared by Mr. Callahan and the Foundation—which only requested the University to negotiate exclusively with the Foundation toward a potential ground lease through October 2025. *See* April 18 Term Sheet at 6 ("(a) From the date of this [letter of intent] until the earlier of the execution of the Ground Lease (and related definitive agreements) or October 18, 2025, Penn shall negotiate exclusively with the Foundation regarding the use or lease of the Premises ….").

47.     Like the April 7 and 11 Term Sheets, the University neither executed the April 18 Term Sheet nor agreed to its terms. Datz Decl. at ¶ 29.

48.     The University Parties attempted to negotiate an agreement in good faith with Mr. Callahan and the Foundation until June 2025, and they reminded Mr. Callahan that these negotiations did not excuse Real's continued failure to pay Rent under the Lease. But Mr. Callahan and the Foundation would not agree to pay any rent and continued to demand that the University agree to a ground lease of the Property. Datz Decl. at ¶ 30.

**D. After the Failure of Negotiations with the Debtors and the Bean Foundation, the University Parties Determined to Terminate Their Relationship with the Debtors and Move On**

49.     Faced with unreasonable demands and convinced that there was no hope of a path forward, the University Parties sought to end their relationship with the Debtors by terminating the Lease and—following the Debtors' refusal to surrender the Premises—initiating eviction proceedings. The University also terminated the Trademark License and—following the Debtors' refusal to cease using the University's "World Café" trademarks—initiated a trademark enforcement action.

50.     Pursuant to the Lease, an Event of Default occurs if Real "defaults in the payment of Rent when due" and fails to cure the default within 10 days of the deadline for paying Rent, Lease, § 20.1(a)(i); a Deliberate Event of Default occurs if Real fails to make timely Rent payments twice within a 12-month period. *Id*., § 20.2(a)(i)(A).

51.     By June 30, 2025, Real owed Hajoca not less than $1,296,996.15 in unpaid Rent and other charges under the Lease.[5] Datz Decl. at ¶ 31.

52.     On July 3, 2025, Hajoca sent Real a default notice and directed Real to cure its default by July 15, 2025. A true and correct copy of the Default Notice is attached to the Datz Decl. as Exhibit P.

53.     Hajoca did not receive any Rent payment after sending the Default Notice. Datz Decl. at ¶ 33.

54.     On July 22, 2025, Hajoca sent Real a notice terminating the Lease, effective immediately, demanding Real vacate the Premises immediately, and notifying Real that any period between the date of the notice and surrender of the Premises, Real shall occupy the Premises as provided in the terms of the Lease ("**Termination Notice**"). A true and correct copy of the Termination Notice is attached to the Datz Decl. as Exhibit Q.

55.     The Debtors did not vacate the Premises or pay any portion of the $1,296,996.15 in unpaid Rent. Datz Decl. at ¶ 35.

56.     On July 22, 2025, Hajoca filed a Complaint for Ejectment against Real in the Philadelphia Court of Common Pleas ("**Philadelphia CCP**"), initiating Case No. 250702482 ("**Ejectment Action**"). By the Ejectment Action, Hajoca requested a judgment in its favor and

---

[5]     Pursuant to the Lease, Real is obligated to pay Hajoca's reasonable attorneys' fees relating to any default by Real under the Lease. *See* Lease, § 21.16. Pursuant to the Lease, any amount owed by Real bears interest at the agreed upon rate. *See id.*, §§ 5.4(c); 20.4(a)(i).

against Real for possession of the Premises and for recovery of monies due, in the amount of $1,296,996.15, together with an award of legal fees, costs, and interest at the rate specified in the Lease. Datz Decl. at ¶ 36.

57. Real also repeatedly failed to pay the licensing fees due under the trademark License Agreement, which constitute events of default thereunder. On November 4, 2025, pursuant to the License Agreement, the University served Real with a Notice of License Termination terminating the License Agreement for failure to pay the required fees. Upon termination of the License Agreement, Real was required to cease and desist all use of the World Café trademarks and any derivatives thereof within sixty (60) days of the date of termination. Datz Decl. at ¶ 37.

58. Despite its obligations under the License Agreement, Real did not cease and desist use of the World Café trademarks by January 3, 2026. Accordingly, on February 10, 2026, the University sent a Final Notice of License Termination and Demand to Cease Use reminding Real of its obligations under the License Agreement and demanding Real cease use of the World Café trademarks by no later than February 17, 2026. Datz Decl. at ¶ 38.

59. Real failed to cease use by close of business on February 17, 2026 as demanded by the University and continued to use the World Café trademarks without authorization from the University on physical signage of the Building, promotional materials, social media and on the worldcafelive.org website. Datz Decl. at ¶ 39.

60. On February 18, 2026, the University commenced an action against Real in the United States District Court for the Eastern District of Pennsylvania (Case No. 2:26-cv-01034-WB), asserting claims for federal trademark infringement, counterfeiting, and unfair competition and false designation of origin under the Lanham Act, common-law trademark infringement, unfair competition, and breach of contract ("**Trademark Action**"). In the Trademark Action, the

University seeks to enjoin Real from infringing the University's World Café trademarks, using the trademarks in business activities, and diluting the University's property rights or goodwill, among other relief. Datz Decl. at ¶ 40.

61.     On or about the Petition Date, Real announced that it was changing the name of the World Café venue to "World Stage." *See* Dan DeLuca, *World Café Live files for bankruptcy*, The Philadelphia Daily News, March 13, 2026, at 1 attached to the Datz Decl. as Exhibit R.  The University reserves all rights with respect to whether such change affects its claims asserted in the Trademark Action.

62.     The Debtors also informed the University Parties that they intended to change the signage on the World Café venue to reflect the name change. Datz Decl. at ¶ 41. Such action would constitute a breach of the Lease. *See* Lease at § 11.2 (requiring University's consent before any changes to the exterior of the building).

63.     Beyond failure to pay rent and unlawful use of the World Café trademarks, Real's misuse of the Premises have harmed the University Parties in other ways. Upon information and belief, Real's liquor license expired as of October 31, 2025, yet alcohol continued to be served at the venue. *See* Lease at § 8.3(i) (requiring Real to comply with all Applicable Laws); Dan DeLuca, *World Café Live's liquor license has lapsed, forcing Free at Noon shows to move*, The Philadelphia Inquirer, November 20, 2025, at 2, https://www.msn.com/en-us/money/companies/world-cafe-live-s-liquor-license-has-lapsed-forcing-free-at-noon-shows-to-move/ar-AA1QPUMa, a true and correct copy of which is attached to the Datz Decl. as Exhibit S.

64.     The Debtors have continued to operate unlawfully at the Premises even after they filed for bankruptcy. On April 4, 2026, the Pennsylvania state police raided the venue and arrested several employees for serving alcohol without a valid liquor license. *See* Dan DeLuca, *The former*

*World Cafe Live — now known as World Stage — got shut down over the weekend for selling liquor without a license*, The Philadelphia Inquirer, April 6, 2026, at 2, https://www.inquirer.com/entertainment/music/world-cafe-live-liquor-license-arrest-20260406.html, a true and correct copy of which is attached to the Datz. Decl. as Exhibit T.

**E. The Debtors and Their Owner Have Gone to Great Lengths to Delay the University Parties' Efforts to Part Ways and Recover Possession of their Assets**

65. On December 15, 2025, less than three weeks before trial in the Ejectment Action, the Debtors and the Foundation (collectively, the "**Bean Plaintiffs**") filed a Complaint against the University Parties in the Philadelphia CCP, initiating Case No. 25120206 (the "**Bean Action**"). A true and correct copy of the Complaint filed in the Bean Action (without exhibits) ("**Bean Complaint**") is attached to the Datz Decl. as Exhibit U.

66. Despite the Lease clearly requiring that any modifications must be in writing, in the Bean Complaint, the Bean Plaintiffs claim, among other things, that the University Parties made promises to them in conversations and negotiations between December 2024 and April 2025 in connection with the Foundation's "Turnaround Plan" to alter operations at the venue that constitute enforceable agreements to (a) modify the Lease so as to not "require the payment of rent as long as WCL provided the University and Hajoca with consideration in the form of goodwill, increased exposure, and other benefits to the University community" (*See, id.* at ¶ 224), and (b) deliver the Ground Lease (*See, id*. at ¶ 164). The term "Ground Lease" appears to refer to a long term (up to 99-years) ground lease for the Hajoca building. *See id*. at ¶¶ 115 & 121. The Bean Plaintiffs apparently claim the terms of the Ground Lease would include no obligation to pay rent. *See id.* at ¶ 136 (claiming the University assured the Foundation that "the Foundation would have the Ground Lease and the Foundation and WCL were assured that there would be flexibility regarding how and when (if at all) WCL made past due and future rent payments.").

17

67.     The Foundation then allegedly relied on the existence of a modified Lease or new Ground Lease when it allegedly made substantial investments in the Debtors. *See id*. at ¶ 24 (alleging Mr. Callahan wired $25,000 to LiveConnections in December 2024); ¶¶ 142-45 (alleging the Foundation assumed certain liabilities of the Debtors and made investments in the Debtors). Notably, the Bean Complaint does not allege that the **Debtors** made any investments or incurred any costs or expenses except in summary fashion in the claims themselves. *See, e.g., id*. at ¶ 196 (LiveConnections alleging that in reliance of alleged promises made by the University, LiveConnecitons invested "significant financial and operational resources" into itself).

68.     The Bean Complaint asserts nine claims against the University Parties: Counts I (Foundation v. University for promissory estoppel), Count II (Foundation v. Hajoca for promissory estoppel), Count III (LiveConnections v. University for promissory estoppel), Count IV (LiveConnections v. Hajoca for promissory estoppel), Count V (Foundation v. University Parties for unjust enrichment), Count VI (LiveConnections v University Parties for unjust enrichment), Count VII (Real v Hajoca for breach of contract), Count VIII (Real v University for tortious interference), and Count IX (LiveConnections v. Hajoca for third-party beneficiary). *See, generally*, Bean Complaint at ¶¶ 160-251.

69.     The University Parties filed an Answer, New Matter, and Counterclaim in the Bean Action on February 17, 2026, a true and correct copy of which ("**Bean Answer**") is attached to the Datz Decl. as Exhibit V. In the Bean Answer, the University Parties deny they waived any rent obligations (past or future) or modified the Lease in connection with negotiations with the Bean Plaintiffs. The University Parties noted that the Lease had always been modified in writing. *See* Bean Answer at ¶ 34. They denied the individuals the Bean Plaintiffs spoke with had any actual

or apparent authority to legally bind the University Parties to any agreement and had not represented otherwise to the Bean Plaintiffs. *Id*. at ¶ 54.

70.     In fact, on December 7, 2025, months **after** these negotiations, the Debtors' CEO J. Sean Diaz admitted in an interview with the Philadelphia Inquirer that the parties had not yet reached an agreement regarding the Lease or the Premises at all. *See* Dan DeLuca, *At World Café Live, harmony proves elusive; Workers say promises were broken. Penn, the venue's landlord, wants to evict it. For now, at least, the show goes on*, The Philadelphia Inquirer, December 7, 2025 ("**Diaz Interview**"), a true and correct copy of which is attached to the Datz Decl. as Exhibit W. According to Mr. Diaz, "There needs to be a meeting of the minds. Penn's main concern, obviously, is getting paid as a landlord and making sure that XPN has the continuity they're [sic] built up in that building." *See Id*. at 3.

71.     Whatever their ultimate aims in the Bean Action, the Bean Plaintiffs clearly intended the Bean Action to at least significantly delay eviction of the Debtors in the Ejectment Action. On December 16, 2025, one day after filing the Bean Complaint, the Bean Plaintiffs filed a motion to consolidate the Bean Action with the Ejectment Action (the "**Consolidation Motion**"). By order dated January 21, 2026, the Philadelphia CCP granted the Consolidation Motion, and the Ejectment Action and Bean Action were consolidated for purposes of discovery and trial (the Ejectment Action and Bean Action, as consolidated, the "**Consolidated Action**").

72.     On March 13, 2026, three days after the bankruptcy petition dates, the Debtors filed a Case Management Memo in the Consolidated Action ("**Case Memo**"). A true and correct copy of the Case Memo is attached to the Datz Decl. as Exhibit X. The Case Memo requests the Consolidated Action be placed on the longest possible track of twenty-four (24) months. *See id.* at 3. As a result, the Debtors have requested that trial not occur in the Consolidated Action until at

least December 2027. The earliest trial could occur (absent delays caused by the Debtors' bankruptcy filings) is January 2027, and only if the Philadelphia CCP decided to go with the 13-month "expedited track." Of course, the Consolidated Action has been stayed by these bankruptcy filings, making a trial in January 2027 all but impossible.

**F. The Debtors Filed the Chapter 11 Cases and Intend to Proceed without Honoring their Obligations Under the Lease or Adequately Protecting the University Parties' Interests**

73. On March 10, 2026 (the "**Petition Date**"), the Debtors filed voluntary petitions for relief under chapter 11 of the bankruptcy code commencing the above-captioned cases (the "**Chapter 11 Cases**").

74. As of the Petition Date, Real owed Hajoca not less than $1,956,163.37 in unpaid rent.

75. On March 11, 2026, the Debtors filed the *Motion of the Debtors and Debtors-in-Possession for an Order Pursuant to 11 U.S.C. § 363 (I) Permitting Use of Cash Collateral and Providing Adequate Protection to Parties with an Interest in Cash Collateral, (II) Authorizing Payment of Prepetition Wages, (III) Providing for an Expedited Hearing, Reduced Notice Period and Limited Notice Pursuant to Federal Rule of Bankruptcy Procedure 9006(c)(1) and E.D.Pa. L.B.R. 5070(F) and for (IV) Related Relief* [D.I. 8] ("**Initial Cash Collateral Motion**") seeking use of the Debtors' cash collateral in accordance with a 30-day budget attached thereto as Exhibit A (the "**Cash Collateral Budget**"). *See* Docket No. 8. In the Initial Cash Collateral Motion, the Debtors allege that "[t]he Debtors… is [sic] at a point where cash flow will support operations without additional cash infusions." *Id*. at ¶ 8. The Cash Collateral Budget shows Gross Profit of $54,654.00, Total Expenses of $46,425.00, leaving a 30-day Net Profit of $8,229.00. It does not include any amount for the payment of Rent. *See id.* at ¶ 18, Ex. A.

76.     The Initial Cash Collateral Motion summarily repeats the unsupported allegations in the Bean Complaint. *See id.* at ¶ 15 (alleging, without any declaration or other evidentiary basis, that the University made promises upon which Mr. Callahan relied in making substantial investments in the Debtors).

77.     On March 31, 2026, the University Parties filed a limited objection to the Initial Cash Collateral Motion that expressly reserved rights with respect to the Debtors' obligation to pay rent during the pendency of these Chapter 11 Cases. *See* D.I. 37.

78.     The University Parties filed only a limited objection to the Initial Cash Collateral Motion because the allegations regarding the University Parties were irrelevant to the relief sought in the Initial Cash Collateral Motion. Moreover, the Debtors' post-petition obligation to pay rent did not begin until April 1, 2026, and the relief sought was expressly limited to use of cash through March 31, 2026. *See* Initial Cash Collateral Motion at ¶ 18. However, the University Parties expressly reserved the right to object to any failure by the Debtors to perform their post-petition obligations under the Lease and to demand adequate protection of the University Parties' interest in the Property. *See id*.

79.     On April 1, 2026, the Debtors circulated a spreadsheet showing actual financial results for March and projections for April ("**March/April Financials**", a true and correct copy of which is attached to the Datz Decl. as Exhibit Y.

80.     The Debtors' actual financial performance in March was significantly worse than the projections in the March 11 Cash Collateral Budget. On March 11, the Debtors projected Net Sales of $142,000.00. *See* Cash Collateral Budget at 1. March Net Sales were only $115,000. *See* March/April Financials at 1.   On March 11, the Debtors projected expenses of $133,771.00. *See*

21

Cash Collateral Budget at 1 (showing total Net Profit of $8,229). Actual expenses in March were $188,911. *See* March/April Financials at 1 (showing total Net Profit of ***negative*** $73,911).

81.     The Debtors projected another massive loss in April. *See* March/April Financials at 2 (showing total net profit of ***negative*** $65,505). Moreover, the April budget had no amount listed for Rent. *See id*.

82.     The exact depth of the Debtors' financial hole is currently unknown because they have failed to file any monthly operating reports.

83.     The terms of the Lease, as amended, require Real to make Rent payments of approximately $75,000 per month. Datz Decl. at ¶ 49.[6] Base Rent is due in advance and payable on or before the first day of each month. *See* Lease at § 5.2(a). Additional Rent is invoiced separately. *See* Lease at § 5.3.

84.     The Debtors continue to possess and use the Premises.

85.     The Lease has neither been assumed nor rejected.

86.     Real has not paid Rent since the Petition Date. Datz Decl. at ¶ 9.

87.     On April 2, 2026, the Debtors filed the *Motion of the Debtors-In-Possession for an Order Pursuant to 11 U.S.C. § 364(b) Authorizing Joseph Callahan to Make a Loan to the Debtors as an Unsecured Administrative Claim* ("**DIP Motion**") [D.I. 40]. The proposed loan is for $75,000, which would not even cover the Debtors' losses suffered in March and projected for April, much less provide for any rent to the University Parties.

---

[6]     The average monthly amount of Rent prior to termination was approximately $50,000. Following termination of the Lease on July 22, 2025, Real became a holdover tenant and Rent increased by 150% as per the terms of the Lease. *See* Lease at § 4.3(b).

**RELIEF REQUESTED**

88.     The University Parties request this Court enter an order directing Real to perform its obligations under the Lease or directing the Debtors to surrender the Premises. Real is leasing the University Parties' property without performing its obligations under the Lease in clear violation of the Bankruptcy Code. The Debtors are using the Premises without adequately protecting the University Parties' interest in the Premises. While such conduct is clearly "cause" to modify the automatic stay and permit eviction to proceed, only the immediate surrender of the Premises will adequately protect the University Parties' interest in the Premises. If the Debtors cannot adequately protect the University Parties' interest, their use of the Premises must be prohibited.

**BASIS FOR RELIEF**

**A.  Real is Required to Perform All Post-Petition Obligations Under the Lease**

89.     The Bankruptcy Code requires a trustee or debtor-in-possession to timely perform its obligations under an unexpired lease[7] of non-residential real property pending the assumption or rejection of a lease.  Bankruptcy Code section 365 provides that "[t]he [debtor] *shall* timely perform all the obligations of the debtor, except those specified in section 365(b)(2), arising from and after the order for relief under any unexpired lease of nonresidential real property, until such lease is assumed or rejected, notwithstanding section 503(b)(1) of [the Bankruptcy Code]."  11 U.S.C. § 365(d)(3) (emphasis added).  Under Bankruptcy Code section 365(d)(3), the Court has an obligation to enforce

---

7    This Motion assumes the Lease remains "unexpired" and therefore subject to assumption or rejection notwithstanding the Termination Notice. *See In re Valentin*, 309 B.R. 715, 718 n.3 (Bankr. E.D. Pa. 2004) (Termination is a state law concept and under Pennsylvania law, a lease is not terminated until the eviction of the lessee is completed) (internal quotations and citations omitted). The question is legally and practically irrelevant for purposes of this Motion. Even if the Lease was effectively terminated on July 22, 2025, the University Parties still have an interest in the Premises as the owner, and the Debtors' use and possession of the Premises without adequately protecting the University Parties' interest must be prohibited.

23

the terms of nonresidential leases. *See In re Kaber Imaging, Inc.*, 262 B.R. 187, 189 (Bankr. D.N.H. 2001).

90. "The clear and express intent of § 365(d)(3) is to require the trustee to perform the lease in accordance with its terms." *In re Montgomery Ward Holding Corp.*, 268 F.3d 205, 209 (3d Cir. 2001). This intent, "evidenced both by the statutory language and the legislative history, makes clear that section 365(d) was amended to protect lessors from the risk of loss in bankruptcy cases due to the trustee [or debtor-in-possession] failing to make timely provision for unexpired leases." *In re Lonuga*, 58 B.R. 503, 506 (Bankr. W.D. Wis. 1986).

91. In this case, Real has failed to pay any post-petition rent and, by the Debtors' Initial Cash Collateral Motion and March/April Financials, they have announced their intention to continue to lease, use, and possess the Premises without paying rent indefinitely, and their inability to pay rent even if they wanted to. Moreover, Real is failing to perform its obligations under the Lease to the extent it is operating unlawfully. Modification of the signage or otherwise altering the Premises without the University's consent would also constitute a breach of the Lease. The Court must order Real to honor the terms of the Lease.

**B. The Only Appropriate Remedy for Real's Failure to Perform is Surrender of the Premises**

92. Real clearly cannot honor the terms of the Lease going forward. Payment of the Rent under the Lease would require approximately $75,000 per month. The March/April Financials clearly show the Debtors' are already operating at a significant loss ***without paying any rent at all***. *See* March/April Financials at 1 (showing Net Profit in March was ***negative*** $73,911 and projecting Net Profit for April of ***negative*** $65,505, with no amount paid for rent). Their actual and projected revenue does not support payment of a $75,000 ***additional*** monthly expense.

24

93.     The $75,000 Loan proposed in the DIP Motion is not even enough to render the Debtors' bankruptcy estates administratively solvent based on their own filings and projections, much less pay ongoing rent. The March/April financials show the Debtors "Net Profits" in March and April are in the total amount of *negative* $139,416, *without paying any rent*. Even if the proposed $75,000 loan has already been funded, their estates appear to have been administratively insolvent on April 30, 2026 by at least $64,416, *without accounting for unpaid rent for March and April*. The University Parties are automatically entitled to an administrative expense claim for all unpaid post-petition rent. *See, e.g.*, *In re Manis Lumber Co.*, 430 B.R. 269, 277 (Bankr. N.D. Ga. 2009) ("Congress enacted § 365(d)(3) to require payment of postpetition rent and other obligations at the contract rate on a timely basis without regard to the 'actual, necessary' requirement of § 503(b)(1) and to relieve landlords from the burden of proving an administrative expense claim."). Permitting the Debtors to continue these Chapter 11 Cases without paying rent not only violates the University Parties' rights, it worsens the prospects of recovery for all creditors.

94.     While section 365(d)(3) expressly requires a debtor-tenant to timely perform all obligations accruing under the lease after commencement of the case, it fails to set out the landlord's remedies in the event of a default. *In re Mr. Gatti's, Inc.*, 164 B.R. 929, 931 (Bankr. W.D. Tex. 1994); *In re Jughandle Brewing Company, LLC*, 2024 WL 2819629 (Bankr. D.N.J. 2024), ("§ 365(d)(3) creates an obligation to perform without a specific remedy for nonperformance"); *In re PYXSYS Corp.,* 288 B.R. 309, 313 (Bankr. D. Mass. 2003) ("365(d)(3) provides a right but no remedy").

95.     Bankruptcy courts may craft various remedies for violations of section 365(d)(3) as required or authorized under the Bankruptcy Code. *In re Jughandle Brewing Company, LLC*, 2024 WL 2819629 at *6 ("[T]he ability to craft a remedy appears to fall squarely within the

25

confines of 11 U.S.C. § 105(a), which allows a court to issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title.") (internal quotations omitted). Many courts order immediate payment of all post-petition rent as an administrative expense claim without the landlord having to prove any benefit to the estate, citing the language of section 365(d)(3) that requires payment "notwithstanding section 503(b)(1)." *See, e.g., In re Pudgie's Dev. of NY, Inc.*, 202 B.R. 832, 836 (Bankr. S.D.N.Y. 1996). A bankruptcy court may also compel immediate rejection of the applicable lease, resulting in surrender of the subject property. *In re DSBI, Inc.*, 407 B.R. 159, 164 (Bankr. D. Del. 2009) ("I now explicitly confirm that an appropriate remedy for a violation of §365(d)(3) is to cause the lease to be rejected in a timely fashioned manner."); *In re U.S. Fax, Inc.*, 114 B.R. 70, 73 (Bankr. E.D. Pa. 1990) (finding that lease rejection required immediate surrender).

96.     If the Debtors do not pay post-petition rent or otherwise fail to perform their obligations under the Lease, the only available remedy is surrender of the Premises. Owners and lessors of real property proposed to be used by a trustee or debtor-in-possession are entitled to adequate protection under section 363(e) and 362(d) of the Bankruptcy Code. *See In re Borbidge*, 66 B.R. 998, 1002 (Bankr. E.D. Pa. 1986) (owner-lessor of unexpired lease of real property entitled to adequate protection under section 363(e) and stay relief under section 362(d)); *In re P.J. Clarke's Rest. Corp.*, 265 B.R. 392, 404 (Bankr. S.D.N.Y. 2001) ("the right to timely payment of rents constitutes an interest in property entitled to adequate protection"); *Memphis-Shelby County Airport Authority v. Braniff Airways, Inc. (In re Braniff Airways, Inc.)*, 783 F.2d 1283, 1286-87 (5th Cir. 1986) (recognizing landlord's right to adequate protection).

97.     A landlord's right to adequate protection follows clearly from the language of section 363(e) of the Bankruptcy Code, which provides that:

26

> Notwithstanding any other provision of this section, at any time, on request of an entity that has an interest in property used, sold, or leased, or proposed to be used, sold, or leased, by the trustee, the court, with or without a hearing, shall prohibit or condition such use, sale, or lease as is necessary to provide adequate protection of such interest.

11 U.S.C. § 363(e); *In re P.J. Clarke's Rest. Corp.*, 265 B.R. 392, 404 (Bankr. S.D.N.Y. 2001).

98.     In order to adequately protect an owner-lessor's interest in real property, a trustee or debtor-tenant must perform post-petition obligations under the lease. *See In re Dabney*, 45 B.R. 312, 313 (Bankr. E.D.Pa. 1985) ("The adequate protection required for a lessor is the performance for which he has contracted."); *In re Borbidge*, 66 B.R. 998, 1004 (Bankr. E.D. Pa. 1986) (ordering trustee to pay all post-petition rent under unexpired lease in order to adequately protect landlord's interest pending assumption or rejection); *In re Knight Jewelry*, 168 B.R. 199, 203 (Bankr. W.D. Mo. 1994) (same); *In re Tihi Rest. Corp.*, No. 22-11216 (JPM), 2023 WL 1768373, at *2 (Bankr. S.D.N.Y. Feb. 3, 2023); *see also In re Mr. Gatti's, Inc.*, 164 B.R. 929, 944 (Bankr. W.D. Tex. 1994) (noting that landlord could demand court prohibit use of property pursuant to section 363(e) and even proceed *ex-parte* to protect its interest pursuant to section 362(f)).

99.     Bankruptcy courts routinely find that failure to pay post-petition rent constitutes "cause" to modify the automatic stay to permit the landlord to pursue eviction proceedings against the debtor in state court. *See* 11 U.S.C. § 362(d)(1) ("On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay… such as by terminating, annulling, modifying, or conditioning such stay—… for cause, including a lack of adequate protection of an interest in property of such party in interest"); *In re Benton*, 662 B.R. 517, 521 (Bankr. S.D.N.Y. 2024) (landlord's right to rent payments was interest in property entitled to adequate protection and failure to pay constituted cause to modify automatic stay to enable landlord to proceed with state court eviction of debtor); *In re Tihi Rest. Corp.*, No. 22-11216 (JPM), 2023 WL 1768373, at

*2 (Bankr. S.D.N.Y. Feb. 3, 2023) (failure to pay post-petition rent constituted cause to modify the automatic stay to permit landlord to proceed with state court eviction of debtor); *In re Richards Pontiac, Inc.*, 6 B.R. 773, 778 (Bankr. E.D.N.Y. 1980) (failure to adequately protect landlord's interest constituted cause to modify automatic stay to permit landlord to proceed with state court eviction of debtor); *In re Hitz Restaurant Group*, 616 B.R. 374, 380 (Bankr. N.D. Illinois 2020) (holding that the debtor's failure to pay post-petition rent "will result in entry of an order by this Court holding that Creditor has 'cause' under § 362(d)(1) to lift the automatic stay because of [d]ebtor's failure to adequately protect [c]reditor's interest in the leasehold"). Real's failure to pay post-petition rent would therefore clearly support modification of the automatic stay to permit the Ejectment Action to proceed.

100.  However, modification of the automatic stay to permit the Ejectment Action to proceed does not satisfy the requirements of section 363(e) of the Bankruptcy Code, which requires the Court to prohibit the Debtors' use of the Premises without adequately protecting the University Parties' interest. The Debtors have intentionally and successfully delayed the Ejectment Action by filing Bean Action, consolidating with the Ejectment Action, and filing the Case Memo requesting a 24-month trial schedule, which would result in a trial no sooner than December 2027. Even if this Court were to modify the automatic stay immediately to permit the Ejectment Action to proceed, it is many months or years from resolution. These Chapter 11 Cases are being run on the University Parties' backs by forcing them to donate months or years of rent to the Debtors. That outcome is expressly prohibited by the Bankruptcy Code.[8]

---

[8]  Merely modifying the stay would also fail to address the issues that must be resolved before the July 8, 2026 deadline for Real to assume the Lease and cure all defaults thereunder. *See* 11 U.S.C. § 365(d)(4)(A)(1) (requiring assumption or rejection of a non-residential lease within 120 days of the petition date); 11 U.S.C. § 365(b)(1)(A) (requiring cure at time of assumption or promptly thereafter). Real appears utterly incapable of curing defaults under the Lease. An amount of not less than $1,956,163.37 was due and owing under the Lease as of the Petition Date. Unpaid rent continues to accrue. The Debtors' revenue is woefully inadequate to cure such a default, or

101.    Modification of the automatic stay, coupled with the delays engineered by the Debtors in the Ejectment Action, will condemn the University Parties to nothing more than a potential allowed administrative expense claim in the Debtors' Chapter 11 Cases. Even if the Chapter 11 Cases were not hopelessly administratively insolvent, the Bankruptcy Code expressly disqualifies an administrative expense claim as an acceptable form of adequate protection.

102.    Examples of acceptable forms of adequate protection are listed in Section 361 of the Bankruptcy Code as follows:

> When adequate protection is required under section 362, 363, or 364 of this title of an interest of an entity in property, such adequate protection may be provided by--
>
> > (1) requiring the trustee to make a cash payment or periodic cash payments to such entity, to the extent that the stay under section 362 of this title, use, sale, or lease under section 363 of this title, or any grant of a lien under section 364 of this title results in a decrease in the value of such entity's interest in such property;
> >
> > (2) providing to such entity an additional or replacement lien to the extent that such stay, use, sale, lease, or grant results in a decrease in the value of such entity's interest in such property; or
> >
> > (3) granting such other relief, ***other than entitling such entity to compensation allowable under section 503(b)(1) of this title as an administrative expense***, as will result in the realization by such entity of the indubitable equivalent of such entity's interest in such property.

103.    11 U.S.C. § 361 (emphasis added). "It is important to note that Congress expressly excluded the granting of an administrative expense as a means of providing adequate protection. 11 U.S.C. s 361(3) (1978). Congress took the position that 'such protection is too uncertain to be meaningful.'" *In re Richards Pontiac, Inc.*, 6 B.R. 773, 778 (Bankr. E.D.N.Y. 1980) (*quoting* Senate Report No. 95-989, 95th Cong.2d Sess. (1978) 54, reprinted in (1978) U.S.Code Cong. and

---

reserve for such a cure pending the outcome of litigation. *See* March/April Financials (showing Net Profits of negative $139,416 through April 2026).

Admin.News, pp. 5787, 5840; 124 Cong.Rec. H 11092 (daily ed. Sept. 28, 1978) (remarks of Rep. Edwards); 124 Cong.Rec. S 17408 (daily ed. Oct. 6, 1978) (remarks of Sen. DeConcini), reprinted in (1978) U.S.Code Cong. and Ad.News, pp. 6436, 6444.).

104. For purposes of adequate protection under section 363(e) of the Bankruptcy Code, the creditor claiming the right to adequate protection need only establish the validity, priority, or extent of its interest in the property, "whereas the debtor . . . must shoulder the initial burden of establishing what constitutes adequate protection vis-à-vis that interest—including the value of the creditor's interest and any decrease therein." *Illinois Dep't of Revenue v. Hanmi Bank*, 895 F.3d 465, 480 (7th Cir. 2018).

105. Here, as the above-cited authorities make clear, the University Parties' interest in the Premises is their right to rent payments and performance of the Lease. The Debtors propose to use the Premises without paying rent. The University Parties' interest must be adequately protected. The Debtors have not proposed any form of adequate protection and appear incapable of providing it. Given these conditions, the University Parties will be left with nothing but an administrative expense claim in these precarious Chapter 11 Cases, a result expressly prohibited by the Bankruptcy Code. If the Debtors cannot or do not pay their Rent, their use of the Premises must be prohibited.

106. This Court should enter an order obligating the Debtors to timely honor their obligations under the Lease including the payment of all Rent. If the Debtors cannot or do not perform, the Order should require the immediate surrender of the Premises. Given the facts and circumstances of these cases, such remedy is the only appropriate option that conforms to the requirements of the Bankruptcy Code.

**C. The Claims in the Bean Complaint Do Not Support the Debtors' Attempt to Avoid Performing their Lease Obligations or Adequately Protect the University Parties' Interest**

107.    In the Bean Complaint, the Foundation and the Debtors assert nine claims against the University and Hajoca. Most of the claims are conditioned on the alleged existence of a modified Lease or new Ground Lease that provide no obligation to pay rent. The Court cannot conclude that the Lease was modified, or that a new Ground Lease was created, because any such agreement must be in writing as required by the statute of frauds. Moreover, promissory estoppel cannot create or modify an agreement that is subject to the statute of frauds. Even if the statute of frauds did not apply, the Lease expressly states that it can only be modified in writing. Therefore, it could only have been modified orally or by conduct if the Debtors prove with clear, precise and convincing evidence that the parties agreed to waive the requirement that modifications be in writing, which they cannot do because the University Parties never agreed to such a waiver.

108.    In the absence of a modified Lease or new Ground Lease that relieves the Debtors of their obligation to pay rent, the only way the Debtors can avoid their payment obligations to the University Parties would be to set off those payment obligations against amounts owed by the applicable University Parties to the Debtors. The Debtors cannot set off any amounts allegedly owed by the University Parties because the Debtors' claims against the University Parties are without merit.

*1. The Lease Was Not Modified and No Ground Lease Was Created*

109.    The statute of frauds as enacted in Pennsylvania (33 Pa. Stat. Ann. § 1 ("**Statute of Frauds**")) requires that any modification of the Lease or creation of a new Ground Lease must be in writing to be enforceable. "Under the statute of frauds, a lease for more than three years must be in writing and signed by the lessor." *Motee v. Bazzazan, Tr. of Sara & Nader Mo Tr.*, 350 A.3d 155 (Table), 2025 WL 2926889, at *9 (Pa. Super. Oct. 15, 2025). "Therefore, '[t]he rule that when

31

a contract is required by the statute of frauds to be in writing its terms cannot be orally modified'

is applicable to leases of more than three years." *In re LRP Mushrooms, Inc.*, No. 09-18529, 2010

WL 2772510, at *13 n.8 (Bankr. E.D. Pa. July 13, 2010) (*quoting Brown, to Use of Par Bond &*

*Mortgage Co. v. Aiken,* 329 Pa. 566, 580, 198 A. 441 (1938)).

110.    Under a narrow equitable exception to the statute of frauds, a lessee must

demonstrate with documentary evidence that it made permanent improvements to the premises in

reliance upon an alleged oral modification to the lease. *Cf. Motee*, 2025 WL 2926889, at *9

(rejecting lessee's requested exemption from statute of frauds when he lived on premises rent free

and failed to show evidence that any alleged "renovations or improvements had, in fact, been

made, such as invoices or receipts establishing the nature, extent, and payments for such

improvements[.]").

111.    In this instance, the Lease term is greater than three years. *See* Seventh Amendment

at 1 (lease term ends on September 30, 2031). Therefore, pursuant to the Statute of Frauds, it could

only have been modified in writing. Similarly, the alleged promised new Ground Lease was also

for a term greater than three years. *See* Bean Complaint at ¶ 86 ("The ground lease would be a

long-duration lease of the land (and Building) that would give the Foundation secure control of

the music venue and would allow the Foundation to borrow against the Building."); April 18 Term

Sheet at 1 (falsely claiming agreement on a 40-year ground lease).  Like the tenant in *Motee*, the

Bean Plaintiffs seek an equitable exemption from the Statute of Frauds based on paying rent "in

the form of goodwill, increased exposure, and other benefits to the University community" (*See*

Bean Complaint at ¶ 224) and making vague, nondescript improvements to the Hajoca building

without documentary evidence or prior notice to the University Parties. (*Id.* at ¶ 210). However,

any alleged amendment or new Ground Lease could only have been created in writing.

32

112.    The Bean Plaintiffs do not allege the existence of any written modification of the Lease or any written Ground Lease, only that the University Parties promised to enter into these agreements. *See, e.g.*, Bean Complaint at ¶ 223 ("The payment terms of the Lease were modified as a result of the parties' course of conduct, discussions, and mutual understanding"), ¶ 164 ("These representations and promises implied, among other things, that the Foundation should expect to receive the Ground Lease."); ¶ 198 ("Specifically, injustice can only be avoided by enforcing the University's promise of a ground lease and rent flexibility to allow WCL to sustainably operate in the Building").[9]

113.    Promissory estoppel cannot create an agreement that must be in writing under the Statute of Frauds. The remedy is limited to money damages in reliance. *See Green v. Interstate United Mgmt. Servs. Corp.*, 748 F.2d 827, 830 (3d Cir. 1984) (promissory estoppel claim based on oral promise to enter a lease limited to monetary damages); *Polka v. May*, 383 Pa. 80, 84, 118 A.2d 154, 156 (1955) (promissory estoppel cannot be invoked against the statute of frauds).

114.    Even if the Statute of Frauds did not apply to the alleged Lease modification, the Lease expressly provides that it can only be subsequently modified in writing. *See* Lease at § 21.6. "Under Pennsylvania law, an agreement that prohibits non-written modification may be modified by subsequent oral agreement if the parties' conduct clearly shows the intent to waive the requirement that the amendments be made in writing." *Atl. Pier Assocs., LLC v. Boardakan Rest. Partners*, 647 F. Supp. 2d 474, 494 (E.D. Pa. 2009) (*citing Accu–Weather v. Prospect Commc'ns.*, 435 Pa. Super. 93 (1994)). "However, an oral contract modifying a prior written contract must be

---

[9] The University Parties never signed any of the April Term Sheets. Even if they had, a signed letter of intent does not satisfy the Statute of Frauds. *See Green v. Interstate United Mgmt. Servs. Corp.*, 748 F.2d 827, 830 (3d Cir. 1984) ("Under Pennsylvania law, 'writings which show that the parties are still in the process of negotiation, ... which look toward some future contract, ... do not satisfy the writing requirement of the statute of frauds.'") (*quoting Conaway v. 20th Century Corp.*, 491 Pa. 189, 201, 420 A.2d 405, 411 (1980)).

proven by 'clear, precise and convincing evidence.'" *Id*. (*citing Somerset Cmty. Hosp. v. Mitchell & Assocs., Inc.,* 454 Pa. Super. 188 (1996)).

115.    The Debtors cannot prove by clear, precise, and convincing evidence that Real and Hajoca intended or agreed to waive the requirement that amendments to the Lease must be made in writing. In fact, all available evidence establishes the opposite conclusion. Between 2003 and 2021, the University Parties had repeatedly agreed to modify the Lease to provide rent adjustments and relief, always in writing, as expressly required under the Lease. On March 25, 2025, substantially contemporaneous with the "late-March" meeting at which the Bean Plaintiffs alleged promises were made to them, Mr. Callahan and the Debtors entered into an agreement that clearly indicated that no agreement had been reached. *See* WCL Transition Agreement ("[Callahan] and WCL *will explore* amending the lease or purchasing the property from the landlord to settle outstanding claims. ***Discussions have also commenced*** with the University of Pennsylvania regarding a ground lease and a potential purchase of the building, which may serve as collateral for restructuring WCL's debt.") (emphasis added).

116.    Throughout April 2025, the Bean Plaintiffs repeatedly delivered term sheets to the University Parties that were expressly non-binding and for discussion purposes. The University signed none of those term sheets. Months later, in December 2025, the Debtors' CEO, Mr. Diaz, admitted publicly that no agreement had been reached because, "There needs to be a meeting of the minds.[10] Penn's main concern, obviously, is getting paid as a landlord and making sure that XPN has the continuity they're [sic] built up in that building." *See* Diaz Interview at 3. More fundamentally, the idea that the University Parties would simply give the Building and the Property

---

[10]    Upon information and belief, Mr. Diaz is a trained attorney, making his use of the phrase "needs to be a meeting of the minds" especially probative of the non-existence of any agreement.

beneath it to the Bean Plaintiffs for virtually nothing after the parties had repeatedly executed written Lease Amendments that adjusted and ratified ongoing rental obligations and past due amounts is facially absurd.  Such specious claims do not justify denial of the University Parties' rights to Real's post-petition performance and adequate protection required under the Bankruptcy Code.

117.    The Court cannot conclude that the Lease was modified, or a new ground lease was created, because the Statute of Frauds requires that such agreements must be in writing and the Debtors do not allege the existence of any written agreement to do either. Even if the Statute of Frauds did not apply to the alleged Lease modification, the Debtors cannot prove with clear, precise, and convincing evidence, as they must, that the Lease was modified to provide them with long-term rent-free use and occupancy of the Premises.  Nor can the Debtors' promissory estoppel claims force either the modification of the Lease or creation of a new ground lease.

### 2. None of the Debtors' Claims for Money Damages Have Merit

118.    Absent the existence of a modified Lease or new ground lease that provides for no rent payments, the Debtors' only possible means of avoiding post-petition rent payments would be to deduct via set off amounts owed to them by the University Parties.[11] The right of setoff allows entities that owe each other money to apply their mutual debts against each other, thereby avoiding "the absurdity of making A pay B when B owes A." *Studley v. Boylston Nat. Bank*, 229 U.S. 523, 528 (1913) (*quoting Citizens Bank of Maryland v. Strumpf*, 516 U.S. 16, 18 (1995)).

---

[11] In addition, the Debtors would only be able to set off the liquidated amount owed by the applicable University Party. The Bean Complaint does not specify what amount is allegedly owed by any University Party to either Debtor. It merely repeatedly requests "monetary damages" in an unspecified amount. *See, e.g.*, Bean Complaint at ¶ 208.  To effectively exercise a set off right, the Debtors will have to prove not just that the applicable University Party was liable, but the amount of damages owed.

119. Section 558 of the Bankruptcy Code provides that "[t]he estate shall have the benefit of any defense available to the debtor as against any entity other than the estate...." 11 U.S.C. § 558. Some courts have held that the debtor's setoff right is a defense under state law which is preserved by section 558. *See, e.g.*, *In re PSA, Inc.*, 277 B.R. 51, 54 (Bankr.D.Del.2002) (holding that "a right to setoff must be established under state law so that the debtor then may assert the setoff as a defense reserved by § 558."); *In re Papercraft Corp.*, 127 B.R. 346, 350 (Bankr.W.D.Pa.1991) (holding that "Section 558 preserves to the Debtor its prepetition [non-bankruptcy] defenses to causes of action.").

120. As an initial matter, courts do not agree on whether a debtor may set off its post-petition obligation to a creditor against the creditor's prepetition obligation owed to the debtors. *Compare In re Telligenix Corp.*, 436 B.R. 211, 215 (Bankr. M.D. Fla. 2010) (denying debtor's motion to require landlord to setoff administrative expense claim for post-petition rent against pre-petition security deposit); *with In re Women First Healthcare, Inc.*, 345 B.R. 131, 134 (Bankr. D. Del. 2006) ("a debtor may set off pre-petition claims against post-petition obligations it owes").

121. Assuming the Court concludes that the Debtors can set off their post-petition payment obligations against amounts owed by the University Parties, only some of the claims asserted in the Bean Complaint would qualify for set off. To exercise the right of setoff, there must be mutuality between the parties. The estate must seek to set off a debt it owes to the creditor against a debt the creditor owes to the estate. *Women First Healthcare,* 345 B.R. at 134–35. In this case, the Debtors could only setoff their payment obligations against amounts owed by the University Parties to the Debtors. Even if the University Parties owed debts to the Foundation (which they do not), those amounts could not be used to set off amounts owed by the Debtors to the University Parties. As a result, any payment obligation of the University Parties under Counts

36

I, II, and/or V of the Bean Complaint, all of which are asserted by the Foundation, would not enable the Debtors to set off their payment obligations to the University Parties.

122.    Even if the Court were to conclude that the Debtors' post-petition payment obligations to the University Parties can be set off against amounts owed to the Debtors by the University Parties under one or more of the remaining Counts in the Bean Complaint, the Debtors cannot exercise any set off rights because their claims against the University Parties asserted in those Counts are without merit.

123.    In Counts III and IV, LiveConnections asserts a claim for promissory estoppel against the University and Hajoca, respectively. *See* Bean Complaint at 24-26. To succeed on a claim for promissory estoppel, a plaintiff must prove (1) the promisor made a promise that it should have reasonably expected would induce action or forbearance on the part of the promisee; (2) the promisee actually took action or refrained from taking action in reliance on the promise; and (3) injustice can be avoided only by enforcing the promise. *Sullivan v. Chartwell Inv. Partners, LP*, 2005 PA Super 124, ¶ 21, 873 A.2d 710, 717–18 (2005). Success "may depend on the reasonableness of the promisee's reliance, on its definite and substantial character in relation to the remedy sought, on the formality with which the promise is made, on the extent to which the evidentiary, cautionary, deterrent and channeling functions of form are met by the commercial setting or otherwise, and on the extent to which such other policies as the enforcement of bargains and the prevention of unjust enrichment are relevant." *Thatcher's Drug Store of W. Goshen, Inc. v. Consol. Supermarkets, Inc.*, 535 Pa. 469, 477, 636 A.2d 156, 160 (1994) (quoting Restatement (Second) Contracts § 90, comment b.).

124.    "Promissory estoppel requires that plaintiffs reasonably rely on a definite promise to their detriment." *Josephs v. Pizza Hut of Am., Inc.*, 733 F. Supp. 222, 226 (W.D. Pa. 1989), aff'd,

899 F.2d 1217 (3d Cir. 1990) (*citing Cardamone v. University of Pittsburgh*, 253 Pa.Super. 65, 384 A.2d 1228, 1233 (1978); *Murphy v. Burke*, 454 Pa. 391, 398, 311 A.2d 904, 908 (1973)). Reliance must be based on the promises of the party to be bound by the estoppel, not simply on the judgment of the promisee. *Josephs v. Pizza Hut*, 733 F. Supp. at 227 (*citing Blofsen v. Cutaiar*, 460 Pa. 411, 418, 333 A.2d 841, 844 (1975)).

125.    In this case, LiveConnections' promissory estoppel claims cannot succeed because they did not reasonably rely on any definite promise by the University Parties. Any detriment they suffered was a product of their own poor judgment.

126.    "The first essential element of promissory estoppel requires an express promise between the promisor and promisee." *Burton Imaging Grp. v. Toys "R" Us, Inc.*, 502 F. Supp. 2d 434, 439 (E.D. Pa. 2007) (*citing C & K Petroleum Prods., Inc. v. Equibank*, 839 F.2d 188, 192 (3d Cir.1988); *KSM Assoc., Inc. v. ACS State Healthcare, LLC*, No. 05–CV–4118, 2006 WL 1308267, at *2 (E.D.Pa.2006)). "A 'broad or vague implied promise' will not suffice." *Burton Imaging*, 502 F. Supp. 2d at 439 (*quoting C & K Petroleum*, 839 F.2d at 192). Even an express promise must indicate with "reasonable certainty" the intent of the parties by including key terms of the agreement. *Burton Imaging*, 502 F. Supp. 2d at 439 (*citing Ankerstjerne v. Schlumberger Ltd.*, No. 03–CV–3607, 2004 WL 1068806, at *5 (E.D.Pa. May 12, 2004), *aff'd*, 155 Fed. Appx. 48 (3d Cir. Sept.1, 2005)).

127.    The Bean Plaintiffs do not allege the University Parties ever made any express promises to the Debtors or the Foundation. The Bean Plaintiffs claim that authorized representatives of the University Parties promised they "would continue to uphold the longstanding financial arrangement with WCL regarding rent flexibility and past due rent." Bean Complaint at ¶ 204. Specifically, the Bean Plaintiffs claim that Craig Carnaroli, Executive Vice

38

President of the University, "stated that while the University could not indefinitely suspend rent payments, it would continue to hold the line as it had for the last several years." *Id*. at ¶ 99. The Bean Plaintiffs allege that at a meeting in early March 2025, "University employee or agent Roger LaMay (the General Manager of WXPN)…" impressed upon the Debtors that WXPN (i.e., the University) and WCL have had a great partnership for a long time, but that they were hoping to reinvigorate the partnership with the Turnaround Plan proposed by the Foundation and the Debtors. *Id*. at ¶ 104. The Bean Plaintiffs claim that in subsequent meetings, Mr. Carnaroli continued to express support for the plan, and assured the Debtors and Foundation that the University "would be open, flexible, and creative regarding past rent that might be owed by WCL." *Id*. at ¶ 134. The Bean Plaintiffs claim the University knew that the Foundation and Debtors could not execute their Turnaround Plan unless the University assured them they would have a new long-term ground lease and "flexibility regarding how and when (if at all) it made past due and future rent payments" and provided those assurances in a meeting in late March 2025. *Id*. at ¶¶ 136-38.

128.    Even if the Bean Plaintiffs can prove that Mr. Carnaroli or Mr. LaMay had actual or apparent authority to act for the University Parties,[12] and the truth of their alleged conduct, their alleged conduct amounts to, at most, statements of general support and optimism regarding a potential future agreement that was yet to be negotiated or entered.  Assurances of a commitment to move forward and enter a future agreement are insufficient to support a promissory estoppel claim because they lack key terms such as payment or the duration of the agreement. *Burton Imaging*, 502 F. Supp. 2d at 439 (assurance that promissor was "going to move ahead" with

---

[12] The Debtors will have to prove that Mr. Carnaroli or Mr. LaMay had actual or apparent authority to legally bind the University Parties. *Josephs v. Pizza Hut*, 733 F. Supp. at 226. Neither Mr. Carnaroli or Mr. LaMay had the actual or apparent authority to bind the University Parties to any agreement to modify the Lease or enter a new ground lease.

promisee was insufficient because it was too vague and did not express the intent of the parties). In fact, the Bean Plaintiffs admit that no promises were made with respect to the key terms of length of the modified Lease or alleged Ground Lease. *See* Bean Complaint at ¶¶ 121-22 (alleging Mr. Caranaroli stated that term length and payment were details to be worked out later and by the parties' attorneys).

129. In addition, the statements allegedly made by Mr. Carnaroli and Mr. LaMay cannot support LiveConnections' claims for promissory estoppel because reliance on them is unreasonable as a matter of law. "Businesses may not rely merely on their own interpretation of the legal significance of a promise." *Id*. The facts and claims in *Josephs v. Pizza Hut* are nearly identical to the situation here. In that case, the plaintiffs claimed that a representative of Pizza Hut of America, Inc. promised to lease a building and represented that corporate approval was a "mere formality." 733 F. Supp. at 223. The representative also wrote in a letter that approval of the lease could not be guaranteed. *Id*. at 227. The plaintiffs purchased the property based on the Pizza Hut's promise. *Id*. The court found plaintiffs' reliance was not reasonable as a matter of law because Pizza Hut was not obligated to enter the new lease when the plaintiffs made their investment, especially in the face of the representative's clear statement that internal approval was not guaranteed. "There can be no estoppel when the plaintiffs' actions were the result of their own will and judgment rather than the product of the defendants' agent's representations." *Id*. at 227.

130. The same result is required here. The Foundation and Debtors' alleged reliance on statements allegedly made by Mr. Carnaroli and Mr. LaMay regarding future modifications to the Lease or the creation of a new ground lease is unreasonable as a matter of law because the University Parties had no obligation to enter those agreements. The Bean Plaintiffs' own term sheets repeatedly stated that discussions were ongoing and no agreement had been reached. To the

40

extent the Debtors made any investments, they relied not on any promises made by the University Parties, but on their own flawed judgment. The Debtors' promissory estoppel claims cannot succeed.

131. In Count VI, LiveConnections claims unjust enrichment against the University Parties. LiveConnections claims to have incurred "costs and expenses with the continued operation of WCL, improvements to the Building, and in connection with the Turnaround Plan for the University and Hajoca Inc.'s benefit fully expecting compensation or other value from the University and Hajoca Inc. in exchange, including but not limited to, continued rent flexibility for past due and near term rent payments." Bean Complaint at ¶ 216.

132. "To sustain a claim of unjust enrichment, a claimant must show that the party against whom recovery is sought either wrongfully secured or passively received a benefit that it would be unconscionable for her to retain." *Torchia on Behalf of Torchia v. Torchia*, 346 Pa. Super. 229, 233 (1985) (*quoting Roman Mosaic & Tile Co. v. Vollrath*, 226 Pa. Super. 215, 218 (1973)) (internal quotation marks omitted). "In order to recover, there must be both (1) an enrichment, and (2) an injustice resulting if recovery for the enrichment is denied." *Id.* (*quoting Samuels v. Hendricks*, 300 Pa. Super. 11, 14–15 (1982)) (internal quotation marks omitted).

133. As an initial matter, any "costs or expenses" incurred by the Debtors in operation of the venue cannot be considered in an unjust enrichment claim because the Debtors are already required to incur those costs and expenses under their agreements with the University Parties. *See Philadelphia Housing Auth. v. CedarCrestone, Inc.*, 562 F. Supp. 2d 653, 655 (E.D. Pa. 2008) (citation omitted) ("[d]ismissal of an unjust enrichment claim is appropriate upon a motion to dismiss when the relationship between parties is founded on a written instrument"); *Ruby v. Abington Mem. Hosp.*, 50 A.3d 128, 136 (Pa. Super. Ct. 2012) (denying recovery under quantum

41

meruit theory because two other parties had entered into an agreement that governed the right to recovery); *Hershey Foods Corp. v. Ralph Chapek, Inc.*, 828 F.2d 989, 999 (3d Cir. 1987) ("[w]here an express contract governs the relationship of the parties, a party's recovery is limited to the measure provided in the express contract; and where the contract 'fixes the value of the services involved,' there can be no recovery under a quantum meruit theory."). *See also McGuckin v. Brandywine Realty Trust*, 185 F. Supp. 3d 600, 607-08 (E.D. Pa. 2016) (finding unjust enrichment claim in employee wage dispute "that presupposes the existence of a valid and enforceable contract is not cognizable under Pennsylvania law"); *Ecore Int'l, Inc. v. Downey*, 343 F. Supp. 3d 459, 496-97 (E.D. Pa. 2018) (holding consultant could not bring unjust enrichment/quantum meruit claims against client, where relationship was governed by written contracts and neither party challenged their validity); *Lackner v. Glosser*, 892 A.2d 21, 25, 33-34 (Pa. Super. Ct. 2006) (concluding suspended vice president could not recover against company for unjust enrichment on assigned patents, where assignments were made by written contract).

134. The Debtors' operation of the venue are the subject of the Lease. Similarly, any reimbursement by the University Parties for any alleged "improvements to the Building" are expressly governed ***and prohibited by*** the Lease. *See* Lease at § 11.4. The Lease expressly provides that all Alterations of the Premises shall remain property of the Landlord "without any obligation of Landlord to pay compensation therefor." *Id*. at § 11.4(b).

135. It is difficult to imagine any "costs or expenses" that were not incurred in operation of the venue or alterations to the Building that benefited the University Parties. To the extent the Debtors incurred "costs and expenses" related to the Turnaround Plan and the University Parties actually benefited from those actions, permitting the University Parties to retain those benefits would not be unconscionable. The Debtors' actions were the product of their own poor judgment.

They were well aware that the University Parties had not agreed to any rent relief or other consideration in exchange for any actions they chose to take in furtherance of their flawed and unrealistic Turnaround Plan.  If anything, it would be unconscionable to force the University Parties, who never entered any agreement to modify the Lease, create a new ground lease, or otherwise related to the Turnaround Plan, to pay anything at all to the Debtors for such unreasonable behavior.

136.    The Debtors' breach of contract, tortious interference, and third-party beneficiary claims asserted in Counts VII, VIII, and IX all fail because they are all premised on the erroneous conclusion that the Lease had been modified. Real's breach of contract claim first states that the Lease was modified to require no payment of rent. *See* Bean Complaint at ¶¶ 223-24. Real then claims Hajoca breached the modified Lease by demanding payment and initiating the Ejectment Action. *See id*. at ¶¶ 227-29. Similarly, Real's claim against the University for tortious interference begins by repeating the allegations that the Lease was modified to require no payment of rent. *See id*. at ¶¶ 233-35. Real then alleges the University improperly interfered with Real's relationship with Hajoca by sending a threatening letter and causing Hajoca to initiate the Ejectment Action. *See id*. at ¶¶ 238-40.  Finally, LiveConnections' claim for damages as an alleged third-party beneficiary begins by claiming the Lease was modified to require no payment of rent. *See id*. at ¶¶ 245-46. LiveConnections then alleges Hajoca breached the modified Lease by demanding past-due rent and initiating the Ejectment Action. *See id*. at ¶¶ 248-50.

137.    All of these claims fail because, as discussed above, the Lease was not modified by any oral or written agreement. The Statute of Frauds prevents modification of the Lease without a written agreement. Promissory estoppel cannot overcome the Statue of Frauds and force the creation of a modified Lease. Even if modification of the Lease were possible notwithstanding the

43

Statute of Frauds, the Lease expressly states it cannot be modified except in writing, and the Bean Plaintiffs cannot show by clear, precise, and convincing evidence that the parties to the Lease agreed to waive that requirement.

138.    In sum, the Debtors' obligations to pay post-petition rent and adequately protect the University Parties' interest cannot be reduced or eliminated by the claims asserted in the Bean Complaint. The Lease was not modified or replaced with a ground lease. The only conceivable way the Debtors could avoid their post-petition payment obligations would be to succeed on a claim for money damages against the applicable University Party to whom the payment obligation is owed. Even if the Court were to conclude that such a set off was permitted, the Debtors' claims against the University Parties for money damages are all fatally flawed. They must pay post-petition rent (and otherwise perform their obligations under the Lease) or surrender the Premises.

## **CONCLUSION**

139.    The Debtors are using the Premises without the payment of any post-petition Rent in violation of the terms of the Lease and the Bankruptcy Code. Moreover, such use without payment fails to adequately protect the University Parties' interest in the Premises. Accordingly, the Court must compel the Debtors to immediately begin honoring their obligations under the Lease, including payment of post-petition rent, or immediately surrender the Premises.

**WHEREFORE**, the University Parties respectfully request that the Court enter an order compelling Real to perform all post-petition obligations under the Lease pursuant to section 365(d)(3) and as required by section 363(e) of the Bankruptcy Code, or if the foregoing cannot be satisfied, directing the Debtors to surrender of the Premises, and granting such other relief as the Court deems just and proper.

Dated: May 20, 2026

**FAEGRE DRINKER BIDDLE & REATH LLP**

*/s/ Joseph N. Argentina, Jr.*
Joseph N. Argentina, Jr.
Sarah E. Silveira *admitted pro hac vice*
Edward J. DeLuca, III
One Logan Square, Suite 2000
Philadelphia, PA 19103
Telephone: (215) 988-2700
Facsimile: (215) 988-2767
joseph.argentina@faegredrinker.com
sarah.silveira@faegredrinker.com
edward.deluca@faegredrinker.com

*Counsel to The Trustees of the University of Pennsylvania and Hajoca 3025, Inc.*